JEAN E. WILLIAMS, Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SETH M. BARSKY, Section Chief
MEREDITH L. FLAX, Assistant Section Chief
BRIENA L. STRIPPOLI, Trial Attorney (MD Bar No. 0612130372)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0339 (t.) | (202) 305-0275 (f.)
Briena.Strippoli@usdoj.gov

JESSICA HELD, Trial Attorney
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0575 (t.) | (202) 305-0506 (f.)
Jessica.Held@usdoj.gov

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, and TURTLE ISLAND RESTORATION NETWORK, | Case No. 4:19-cv-03135-KAW |
| Plaintiffs, | |
| v. | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |
| WILBUR ROSS, in his official capacity as Secretary of Commerce, and NATIONAL MARINE FISHERIES SERVICE, | |
| Defendants. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   STATUTORY BACKGROUND.......................................................................... 3

      A.    Endangered Species Act ........................................................................... 3

      B.    National Environmental Policy Act........................................................... 4

      C.    Magnuson-Stevens Fishery Conservation and Management Act ............. 5

III.  FACTUAL BACKGROUND.............................................................................. 6

IV.   STANDARD OF REVIEW ................................................................................ 8

V.    ARGUMENT ..................................................................................................... 9

      A.    NMFS's Biological Opinion comports with the ESA: it incorporates the
            "best scientific data available" and properly determined that the EFPs
            would result in "no jeopardy." ................................................................. 9

            1.    NMFS's Biological Opinion Is Rational Because It Was Based on
                  the "Best Scientific and Commercial Data Available." ............................ 9

                  a.    The 2017 Biological Opinion is extra-record evidence; even if
                        admitted, it confirms that NMFS relied on the best scientific
                        data available. ......................................................................... 9

                  b.    NMFS relied on the best available estimate of average
                        abundance of leatherback sea turtles foraging in neritic
                        California waters. ..................................................................... 11

                  c.    NMFS relied on the best available Hawaii longline observer
                        data. ......................................................................................... 13

            2.    NMFS properly concluded that the EFPs for two vessels for a finite
                  period of two years to conduct exploratory fishing would result in
                  "no jeopardy." .......................................................................................... 14

      B.    NMFS'S EA COMPLIED WITH NEPA. ................................................ 21

            1.    NMFS Considered A Reasonable Range Of Alternatives Consistent
                  with the Purpose and Need of the Project, Thereby Satisfying
                  NEPA. ...................................................................................................... 21

            2.    NMFS Complied With NEPA By Conducting A Reasonable
                  Cumulative Impacts. ................................................................................ 24

3. An EIS Is Not Required. ........................................................ 25

  a. NMFS Properly Examined the Impact of the EFP on Leatherback Turtles. .......................................... 26

  b. NMFS Adequately Considered Whether the Effects of the EFP Are Highly Controversial. .............................. 26

  c. NMFS Adequately Considered Whether the EFP Violated California State Law. .......................................... 27

  d. NMFS Adequately Considered Cumulative Impacts to Leatherback Turtles. .......................................... 28

C. BECAUSE NMFS ISSUED THE TWO EFPs IN COMPLIANCE WITH ALL APPLICABLE LAWS, IT DOES NOT VIOLATE THE MSA. ................. 28

V. CONCLUSION ................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Akiak Native Cmty. v. U.S. Postal Serv.*,
    213 F.3d 1140 (9th Cir. 2000) ............................................................ 25

*Am. Wildlands v. Kempthorne*,
    530 F.3d 991 (D.C. Cir. 2008) ............................................................ 14

*Bark v. U.S. Bureau of Land Mgmt.*,
    643 F. Supp. 2d 1214 (D. Or. 2009) .................................................... 25

*Bennett v. Spear*,
    520 U.S. 154 (1997) ............................................................................ 12

*Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*,
    524 F.3d 938 (9th Cir. 2008) .............................................................. 24

*Blue Mountains Biodiversity Project v. Blackwood*,
    161 F.3d 1208 (9th Cir. 1998) ............................................................ 25

*Clyde K. v. Puyallup Sch. Dist.*,
    35 F.3d 1396 (9th Cir. 1994) ................................................................ 9

*Council v. Weldon*,
    697 F.3d 1043 (9th Cir. 2012) .............................................................. 9

*Ctr for Biological Diversity v. Dep't of Fish & Wildlife*,
    62 Cal. 4th  204 (2015) ...................................................................... 27

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*,
    655 F.3d 1000 (9th Cir. 2011) ............................................................ 24

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S.752 (2004) .............................................................................. 5

*Duncan's Point Lot Owner's Ass'n v. FERC*,
    522 F.3d 371 (D.C. Cir. 2008) .............................................................. 5

*Earth Island Inst. v. Carlton*,
    626 F.3d 462 (9th Cir. 2010) ................................................................ 8

*Friends of the Santa Clara River v. Corps of Eng'rs*,
    887 F.3d 906 (9th Cir. 2018) ................................................................ 3

*Headwaters, Inc. v. Bureau of Land Mgmt.*,
    914 F.2d 1174 (9th Cir. 2004) ............................................................ 21

*Humane Soc'y of the U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ............................................................ 26

*Inland Empire Pub. Lands Council v. U.S. Forest Serv.*,
    88 F.3d 754 (9th Cir. 1996) .................................................................. 5

*Karuk Tribe v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) ................................................................. 8

*Kern Cty. Farm Bureau v. Allen*,
450 F.3d 1072 (9th Cir. 2006) ............................................................... 11

*Klamath Siskiyou Wildlands Ctr. v. Gerritsma*,
962 F. Supp. 2d 1230 (D. Or. 2013) ........................................................ 9

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) .............................................................................. 9

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ............................................................. 8, 9

*Lands Council v. McNair*,
629 F.3d 1070 (9th Cir. 2010) ......................................................... 18, 21

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) ............................................................... 10

*Marsh v. Or. Nat Res. Council*,
490 U.S. 360 (1989) ............................................................................ 25

*Modesto Irrigation Dist. v. Gutierrez*,
619 F.3d 1024 (9th Cir. 2010) ............................................................... 8

*Montana Wilderness Ass'n. v. Connell*,
725 F.3d 988 (9th Cir. 2013) ................................................................ 24

*Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................... 8

*Nat. Wildlife Fed'n v. Nat. Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ......................................................... 17, 19

*Native Ecosystems Council v. U.S. Forest Service*,
428 F.3d 1233 (9th Cir. 2005) ......................................................... 4, 21

*Occidental Eng'g Co. v. INS*,
753 F.2d 766 (9th Cir. 1985) ................................................................. 9

*Oceana v. Pritzker*,
75 F. Supp. 3d 469 (D.D.C. 2014) ........................................................ 20

*ONRC Action v. Bureau of Land Mgmt.*,
150 F.3d 1132 (9th Cir. 1998) ............................................................... 8

*Or. Envtl. Council v. Kunzman*,
817 F.2d 484 (9th Cir. 1987) ................................................................. 4

*Robertson v. Methow Valley Citizens Council*,
490 U.S. 332 (1989) ......................................................................... 4, 5

iv

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
   747 F.3d 581 (9th Cir. 2014) ................................................................. 11, 12, 13

*Seattle Audubon Soc'y v. Moseley,*
   80 F.3d 1401 (9th Cir. 1996) ....................................................................... 21

*Selkirk Conservation All. v. Forsgren,*
   336 F.3d 944 (9th Cir. 2003) ........................................................................ 8

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
   671 F.3d 1113 (9th Cir. 2012) ................................................................. 9, 25

*Trout Unlimited v. John,*
   645 F. Supp. 2d 929 (D. Or. 2007) ............................................................ 13

*Trout Unlimited v. Morton,*
   509 F.2d 1276 (9th Cir. 1974) ..................................................................... 4

*Turtle Island Restoration Network v. U.S. Dep't of Commerce,*
   878 F.3d 725 (9th Cir. 2017) ............................................................ 17, 18, 19

*UFO Chuting of Hawaii, Inc. v. Young,*
   327 F.Supp. 2d 1220 (D. Haw. 2004) ........................................................ 28

*Westland Water Dist. v. U.S. Dep't of the Interior,*
   376 F.3d 853 (9th Cir. 2004) ................................................................ 21, 24

*Wild Wilderness v. Allen,*
   871 F.3d 719 (9th Cir. 2017) ..................................................................... 26

*WildEarth Guardians v. Provencio,*
   923 F.3d 655 (9th Cir. 2019) ..................................................................... 25

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................ 8

16 U.S.C. § 1362(13) ..................................................................................... 27

16 U.S.C. § 1532(19) ....................................................................................... 4

16 U.S.C. § 1532(6) ....................................................................................... 21

16 U.S.C. § 1536 ............................................................................................. 3

16 U.S.C. § 1536(a)(2) ................................................................................. 3, 10

16 U.S.C. § 1536(b)(3)(A) .............................................................................. 3, 4

16 U.S.C. § 1536(b)(4) (C)(i)-(ii) ....................................................................... 4

16 U.S.C. § 1536(b)(4)(C)(ii) ............................................................................ 4

16 U.S.C. § 1536(o)(2) ..................................................................................... 4

16 U.S.C. § 1801(b)(1) ............................................................................ 5, 6

16 U.S.C. § 1851(a) .............................................................................. 6, 28

16 U.S.C. § 1852(b) .................................................................................. 6

16 U.S.C. § 1852(h) .................................................................................. 6

16 U.S.C. § 1853(a)(1)(C) ..................................................................... 6, 28

16 U.S.C. § 1855(f)(1)(B) ......................................................................... 8

42 U.S.C. § 4332(2)(C) ............................................................................ 5

**Regulations**

40 C.F.R. § 1501.3 .................................................................................. 5

40 C.F.R. § 1501.4(c) .............................................................................. 5

40 C.F.R. § 1501.4(e) .............................................................................. 5

40 C.F.R. § 1508.13 ................................................................................ 5

40 C.F.R. § 1508.27 ............................................................................... 25

40 C.F.R. § 1508.27(b)(10) ...................................................................... 27

40 C.F.R. § 1508.27(b)(9) ....................................................................... 26

40 C.F.R. § 1508.9 .................................................................................. 5

50 C.F.R. § 402.02 ......................................................... 4, 15, 16, 17, 20

50 C.F.R. § 402.14(a) .............................................................................. 3

50 C.F.R. § 402.14(g)(2) .......................................................................... 4

50 C.F.R. § 402.14(h)(3) .......................................................................... 4

50 C.F.R. § 600.745(b) ......................................................................... 6, 28

50 C.F.R. § 660.718 ................................................................................. 6

50 C.F.R. § 665.813(f) ............................................................................. 7

50 C.F.R. pt. 402 .................................................................................... 3

81 Fed. Reg. 60,675 ................................................................................ 7

84 Fed. Reg. 20,108 (May 8, 2019) ......................................................... 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Notice is hereby given, under Local Civil Rule 7, that on December 5, 2019, or as soon as this matter may be heard, in the Courtroom of the Honorable Magistrate Judge Kandis A. Westmore, Defendants Wilbur Ross, in his official capacity as Secretary of Commerce, and the National Marine Fisheries Service (collectively "Defendants"), will cross-move this Court for summary judgment, pursuant to Federal Rules of Civil Procedure 56 and Local Civil Rule 56. Defendants' decisions comport with the Endangered Species Act ("ESA"), the National Environmental Policy Act ("NEPA"), and the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and are supported by the administrative record.

## MEMORANDUM OF LAW

## I.   INTRODUCTION

Because U.S. West Coast swordfish catch has declined by 96% and participation in the main authorized fishery is declining. NMFS authorized Exempted Fishing Permits ("EFP"), which mandate hard caps and 100% observer coverage, to just two vessels to conduct exploratory longline fishing for two years in the West Coast Exclusive Economic Zone ("EEZ"). Plaintiffs challenge to NMFS's issuance of these permits as violative of the ESA, NEPA, and MSA is meritless.

First, NMFS's decision complies with the ESA.  NMFS used the "best scientific data available" and employed the proper jeopardy analysis to determine that the EFPs would not appreciably reduce the survival and recovery of the leatherback sea turtle population.[1]  Plaintiffs' cite to three purported sources of "superior" data that the Biological Opinion failed to consider:  (1) the 2017 Turtle Research Programmatic Biological Opinion ("2017 BiOp"), Dkt. No. 27-2; (2) an email containing an estimate of the average number of western Pacific leatherback turtles

---

[1] Leatherbacks are listed as endangered throughout their global range. Increases in the number of nesting females have been noted in some sites in the Atlantic, but there have been substantial declines or collapse of some populations in the Pacific, where nesting aggregations are found in both the Eastern and Western Pacific. NMFS and the United States Fish and Wildlife Service are currently in the process of re-examining the status of leatherbacks and whether the species listing should be divided into Distinct Population Segments. AR 18 at 1041-1042.

foraging in the coastal California waters, AR 362 at J_0000460; and (3) 2017 Hawaii longline observer data. *Id.* However, none of these constitute better scientific data that was available. First, the 2017 BiOp is extra record evidence that should not be admitted. However, even if it is admitted, it does not support Plaintiffs' contention that it shows an "80 percent" reduction in the nesting female western Pacific leatherback sea turtle subpopulation, and, in any event, it relies on the *same* data as the biological opinion in this case. Second, the preliminary estimate of the number of western Pacific leatherbacks in neritic California waters expressed in an email was not the "best" data because it had not been peer-reviewed and lacked a key analysis. Third, the pertinent proxy data needed from the 2017 Hawaii longline observer data was not sufficiently developed by the Pacific Islands Regional Office ("PIRO") prior to completion of the biological opinion and, thus, was unavailable. Plaintiffs' arguments that NMFS employed an unlawful jeopardy analysis and that, even if it was lawful, its "no jeopardy" determination is not supported by the record are also without merit. The record makes clear that NMFS properly aggregated the effects of the action, the environmental baseline, and cumulative effects, in light of the status of the species, to find that the EFPs did not reduce appreciably the leatherback sea turtle's likelihood of survival and recovery, and the record supports this determination.

Second, NMFS's decision complies with the National Environmental Policy Act ("NEPA"). The record shows that NMFS considered a reasonable range of alternatives consistent with the purpose and need of the project, conducted a reasonable cumulative impacts analysis, and properly concluded that issuance of the EPFs would not have a significant impact on the environment necessitating the preparation of an Environmental Impact Statement.

Lastly, because NMFS's issuance of the permits comported with the ESA, NEPA, and Administrative Procedure Act, it did not violate the MSA. Accordingly, Plaintiffs' motion for summary judgment should be denied, and Defendants' cross-motion for summary judgment should be granted.

1    **II.      STATUTORY BACKGROUND**

2           **A. Endangered Species Act**

3           Under Section 7(a)(2) of the ESA, each federal agency must, in consultation with either

4    the United States Fish and Wildlife Service ("FWS") or NMFS, ensure that "any action

5    authorized, funded, or carried out by such agency" is not likely to jeopardize the continued

6    existence of any endangered or threatened species or result in the destruction or adverse

7    modification of the designated "critical habitat" of the species.  16 U.S.C. § 1536(a)(2), (4).

8    Section 7 and its implementing regulations describe a detailed consultation process for

9    determining the biological impacts of a proposed activity.  16 U.S.C. § 1536; 50 C.F.R. pt. 402.

10   An agency proposing an action must first determine whether the action "may affect" listed

11   species or critical habitat.  50 C.F.R. § 402.14(a).  If an action agency determines that a

12   particular action will have no effect on a listed species or critical habitat, the consultation

13   requirements are not triggered.  *Friends of the Santa Clara River v. U.S. Corps of Eng'rs*, 887

14   F.3d 906, 926 (9th Cir. 2018).  But if the agency determines that its action "may affect" listed

15   species, then it must consult with FWS or NMFS (depending on the species involved).  Where,

16   as here, ESA Section 7 consultation is required for an EFP to a Fishery Management Plan,

17   NMFS is both the "action" agency (Sustainable Fisheries Division "SFD") and the "consulting"

18   agency (Protected Resources Division "PRD").

19          Formal consultation is required only if the action is likely to adversely affect listed

20   species or critical habitat.  50 C.F.R. § 402.14(a).  In that event, the consulting agency—here,

21   NMFS PRD—issues a biological opinion detailing how the proposed action will affect the listed

22   species and determining whether the proposed action is likely to jeopardize the continued

23   existence of a listed species or result in the destruction of adverse modification of critical habitat.

24   16 U.S.C. § 1536(b)(3)(A).  In completing its analysis, NMFS must use "the best scientific and

25   commercial data available."  16 U.S.C. § 1536(a)(2).  The ESA's regulations define to

26   "jeopardize the continued existence of" as "to engage in an action that reasonably would be

27   expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and

28   recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of

1   that species." 50 C.F.R. § 402.02.  To prepare its biological opinion, NMFS must evaluate the

2   current status of the species overall and in the action area, the environmental baseline, and the

3   effects of the action and cumulative effects on the listed species in the action area.  50 C.F.R. §

4   402.14(g)(2) & (3).  The jeopardy analysis consists of a synthesis of the effects of the action

5   within the action area upon the status of the species as a whole, taking into account the

6   environmental baseline and cumulative effects.  50 C.F.R. § 402.02.

7         If NMFS concludes that an action is likely to cause "jeopardy," then it must propose a

8   "reasonable and prudent alternative" to the proposed action.  16 U.S.C. § 1536(b)(3)(A); 50

9   C.F.R. § 402.14(h)(3).  On the other hand, if NMFS determines that the action is not likely to

10  jeopardize listed species, but may result in the incidental "take"[2] of some members of the

11  species, NMFS must provide an "incidental take statement" ("ITS") along with its biological

12  opinion.  16 U.S.C. § 1536(b)(4)(C)(i)-(ii).  That ITS must describe the effect of the incidental

13  taking on the species and set forth those reasonable and prudent measures ("RPMs") that NMFS

14  considers "necessary or appropriate to minimize such impact."  16 U.S.C. § 1536(b)(4)(C)(ii).

15  "[A]ny taking that is in compliance with the terms and conditions specified in a written [ITS] . . .

16  shall not be considered to be a prohibited taking of the species concerned."  16 U.S.C. §

17  1536(o)(2).

18         **B.  National Environmental Policy Act ("NEPA")**

19         NEPA does not impose any substantive obligations upon an agency, but it does require

20  that an agency take a "hard look" at the environmental consequences of its decision-making.

21  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  In taking a "hard

22  look," an agency must include a discussion of adverse impacts.  *Native Ecosystems Council v.

23  U.S. Forest Service,* 428 F.3d 1233, 1241 (9th Cir. 2005). Specifically, the document must

24  contain "a reasonably thorough discussion of the significant aspects of the probable

25  environmental consequences."  *Or. Envtl. Council v. Kunzman,* 817 F.2d 484, 492 (9th Cir.

26  1987) (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)).

27  _____

28  [2] "Take" is broadly defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or
collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).

1       NEPA serves the dual purpose of, first, informing agency decisonmakers of the

2  significance of environmental effects of proposed major federal actions and, second, insuring

3  that relevant information is made available to the public so that they "may also play a role in

4  both the decisionmaking process and the implementation of that decision." *See Robertson*, 490

5  U.S. at 349.  To meet these dual purposes, NEPA requires that an agency prepare a

6  comprehensive Environmental Impact Statement ("EIS") for "major Federal actions significantly

7  affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.

8  However, not every federal action or proposal requires preparation of an EIS.  Where the

9  environmental impacts of an action are less than "significant," an agency may comply with

10  NEPA though preparation of an environmental assessment ("EA") and a Finding of No

11  Significant Impact ("FONSI").  *See* 40 C.F.R. §§ 1501.3; 1501.4(c), (e); 1508.9.

12       An EA is to be a "concise public document" that "[b]riefly provide[s] sufficient evidence

13  and analysis for determining whether to prepare an [EIS].  *Dep't of Transp. v. Pub. Citizen*, 541

14  U.S.752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)(1)).  If, pursuant to the EA, an agency

15  determines that an EIS is not required under applicable CEQ regulations, it must issue a FONSI,

16  which briefly presents the reasons why the proposed agency action will not have a significant

17  impact on the environment.  *Id.* at 757-58; 40 C.F.R. §§ 1501.4(e), 1508.13.

18       "The NEPA process involves an almost endless series of judgment calls," and "the line-

19  drawing decisions necessitated by the [NEPA process] are vested in the agencies, not the courts.

20  *Duncan's Point Lot Owner's Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (quotations

21  omitted).  "NEPA's goal is satisfied once … information is properly disclosed; thus, NEPA

22  exists to ensure a process, not to ensure any result."  *Inland Empire Pub. Lands Council v. U.S.*

23  *Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996) (citation omitted).

24  **C.  Magnuson-Stevens Fishery Conservation and Management Act ("MSA")**

25       The MSA was enacted "to take immediate action to conserve and manage the fishery

26  resources found off the coasts of the United States . . ." and "to promote domestic, commercial,

27  and recreational fishing under sound conservation and management principles . . . ."  16 U.S.C. §

28  1801(b)(1), (3).  The MSA created a comprehensive system for the conservation and

1  management of domestic marine fisheries by establishing eight regional fishery management

2  councils that are responsible for preparing fishery management plans for fisheries subject to the

3  statute.  16 U.S.C. §§ 1801(b)(1), 1852(h).  The councils are composed of Federal, State, and

4  territorial fishery management officials, participants in commercial and recreational fisheries,

5  and other individuals with scientific experience or training in fishery conservation and

6  management.  16 U.S.C. § 1852(b).  All fishery management plans and implementing regulations

7  must be consistent with the ten national standards set out in the MSA and any other applicable

8  law.  16 U.S.C. §§ 1851(a), 1853(a)(1)(C).  If a target or incidental harvest of species managed

9  under a fishery management plan or fishery regulations is prohibited, the NMFS Regional

10  Administrator or Director may authorize an EFP "for limited testing, public display, data

11  collection, exploratory fishing, compensation fishing, conservation engineering, health and

12  safety surveys, environmental cleanup, and/or hazard removal purposes."  50 C.F.R. §

13  600.745(b).

14  **III.      FACTUAL BACKGROUND**

15          Plaintiffs are challenging the NMFS' issuance of two EFPs that allow two vessels to

16  conduct longline fishing in the West Coast Exclusive Economic Zone ("EEZ") for a temporally

17  restricted period of two years.  Dkt. No. 1, 27; AR 50-51.  Since 1985, United States West Coast

18  swordfish catch has declined 96% due in large part to attrition in the drift gillnet fishery.  AR 1 at

19  00013.  Because the drift gillnet fishery is in decline and drift gillnet and harpoon were the only

20  commercial gears permitted to catch swordfish in the United States West Coast EEZ, the Pacific

21  Fishery Management Council ("Fishery Council") solicited requests for EFP proposals to test

22  alternative gears, approaches, or methods that would catch swordfish in volume needed to satisfy

23  United States demand.  *Id.* at 00013-14; *see* 50 C.F.R. § 660.718.  After receiving proposals, the

24  Highly Migratory Species Advisory Subpanel determined that pelagic longline gear could be an

25  economically feasible alternative to drift gillnet for harvesting swordfish.  *Id.* at 00013-14 (citing

26  AR 268); *see* 50 C.F.R. § 660.718.

27          "Longline" fishing is a commercial fishing method that involves setting a single,

28  horizontal mainline to which shorter branchlines are attached at intervals each ending in a single,

1    baited hook.  AR 18 at 01028-29.  Shallow-set longlines are typically set at less than 328 feet to

2    target swordfish, and deep-set longlines are typically set at approximately 984-1,312 feet to

3    target tuna.  *Id.* at 01029.  While longline gear can ensnare non-target species or "bycatch," such

4    as sea turtles, several gear modifications have proven to significantly reduce sea turtle

5    interactions, injuries, and mortalities.  AR 1 at 00014 (citing AR 168 & 199); *see also* AR 18 at

6    01031 (citing AR 151 & 168).  For example, after regulations mandated the use of circle hooks

7    (vs. J hooks) and fish bait (vs. squid bait) in the Hawaii longline fishery, rates of Pacific

8    leatherback sea turtle bycatch significantly declined by 84%.  AR 168 at 05279; *see also* 50

9    C.F.R. § 665.813(f), (g).

10       In 2015, the Council recommended that NMFS authorize two EFPs to two vessels for a

11   period of two years to allow exploratory longline fishing to gauge impacts, determine whether

12   this type of fishing is economically viable, assess the type and extent of interactions with

13   protected species, and test mitigation measures appropriate to minimize adverse environmental

14   impacts.  AR 1 at 00013-14; AR 18 at 01026.  NMFS accepted public comment on the EFPs.

15   AR 1 at 00015; AR 18 at 01026.  In December 2016, NMFS SFD requested formal consultation

16   with NMFS PRD; initiation of formal consultation commenced once further information had

17   been provided, resulting in a July 2018 Biological Opinion.  AR 18 at 01026.  In April 2019,

18   after receiving comments on the draft Environmental Assessment, *see* AR 1 at 00016 (citing 81

19   Fed. Reg. 60,675), NMFS issued a Final Environmental Assessment and finding of no significant

20   impact ("FONSI"), AR 1 at 00276-84, thus no environmental impact statement ("EIS") for the

21   EFPs was required.  *See generally* AR 1.  Accordingly, NMFS issued two EFPs to two vessels to

22   conduct exploratory longline fishing for the limited period of two years, active upon signature of

23   the fishermen.  AR 50 & 51; Magnuson-Stevens Fishery Conservation & Management Act, 84

24   Fed. Reg. 20,108 (May 8, 2019).

25       In an effort to minimize the impacts of any interactions with protected species, numerous

26   safeguards were mandated as part of the EFPs.  The EFPs require 100% observer coverage,

27   which means that observers must be deployed on all trips and observe all sets.  AR 18 at 01030.

28   Furthermore, the EFPs place strict limits on species interactions.  If the species limit is reached

1   on the number of hooked or entangled leatherback or loggerhead turtles (3 encounters and 2

2   encounters, respectively), fishing under the EFPs—for both long and shallow set longlines—

3   must cease immediately.  *Id.*  Similarly, if an observer were to record a single observed mortality

4   of a leatherback sea turtle, fishing under the EFPs—for both long and shallow set longlines—

5   must cease immediately.  *Id.*  The EFPs also require all current sea turtle take mitigation

6   measures, including gear modifications—such as circle hooks, offsets, and different types of

7   bait—that have been proven to reduce leatherback bycatch rates by 84%.  AR 18 at 01031 (citing

8   AR 151 & 168).  In addition, the EFPs require skipper education on sea turtles, that all sea turtles

9   be released from fishing gear in a manner that increases post-release survivorship, including

10  requiring each vessel to have specialized tools, and that any lethargic turtles be brought aboard to

11  allow recovery and any comatose turtles be resuscitated before being safely released.  AR 18 at

12  01030-31, 01087-89.

13  **IV.   STANDARD OF REVIEW**

14          Claims under the ESA, MSA, and NEPA are reviewed under the standards set forth in the

15  APA. *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*en banc*) (ESA);

16  *ONRC Action v. Bureau of Land Mgmt.,* 150 F.3d 1132, 1135 (9th Cir. 1998) (NEPA); 16 U.S.C.

17  § 1855(f)(1)(B).  The APA provides that a reviewing court may set aside "agency action,

18  findings, and conclusions" that it finds to be "arbitrary, capricious, an abuse of discretion, or

19  otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); *see Earth Island Inst. v. Carlton*,

20  626 F.3d 462, 468 (9th Cir. 2010).  Review under this standard is deferential, with a presumption

21  in favor of finding the agency action valid in areas involving a "high level of technical exper-

22  tise."  *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc) (citing *Selkirk*

23  *Conservation All. v. Forsgren,* 336 F.3d 944, 954 (9th Cir. 2003)).  Under such deferential

24  review, the reviewing court may not substitute its judgment for that of the agency, *Motor Vehicle*

25  *Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and must uphold the

26  agency's reasonable decision "even if the administrative record contains evidence for and against

27  its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010)

28  (citation omitted).  A court may find that an agency has acted "arbitrarily and capriciously only

1   when 'the record plainly demonstrates that [the agency] made a clear error in judgment in

2   concluding that a project meets the [statutory] requirements.'"   *Native Ecosytem. Council v.*

3   *Weldon*, 697 F.3d 1043, 1052 (9th Cir. 2012) (quoting *Tri-Valley CAREs v. U.S. Dep't of*

4   *Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012)); *McNair*, 537 F.3d at 994.

5          The burden of demonstrating that the agency action does not meet the APA's highly

6   deferential standard rests with the plaintiff.   *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976);

7   *Clyde K. v. Puyallup Sch. Dist.*, 35 F.3d 1396, 1398 (9th Cir. 1994).   Finally, in an APA

8   proceeding, there are no material facts in dispute because the Court does not act as a fact finder.

9   *See*, *e.g.*, *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985); *see also Klamath*

10  *Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1233 (D. Or. 2013) (under the APA,

11  summary judgment standards do not apply and the court uses the phrase "summary judgment"

12  simply as a convenient label).   Instead, judicial review is based upon the administrative record.

13  *See id.*

14  **V.    ARGUMENT**

15        **A.    NMFS's Biological Opinion comports with the ESA: it incorporates the "best
16             scientific data available" and properly determined that the EFPs would
               result in "no jeopardy."**
17

18             **1.    NMFS's Biological Opinion Is Rational Because It Was Based on the
                      "Best Scientific and Commercial Data Available."**

19        Plaintiffs' first attack on the Biological Opinion is that it failed to consider the "best scientific

20  and commercial information available." *See* Dkt. No. 26 at 18-21.   Specifically, Plaintiffs cite to

21  three purported sources of "superior" data that the Biological Opinion failed to consider:  (1) the

22  2017 Turtle Research Programmatic Biological Opinion ("2017 BiOp"), Dkt. No. 27-2; (2) an

23  email containing an estimate of average number of western Pacific leatherback turtles foraging in

24  the neritic California waters, AR 362 at J_0000460; and (3) 2017 Hawaii longline observer data.

25  *Id.*   However, Plaintiffs arguments are misplaced as none of these contain superior data that was

26  available.

27                  **a.    The 2017 Biological Opinion is extra-record evidence; even if
                          admitted, it confirms that NMFS relied on the best scientific data
28                        available.**

1    For the reasons stated more fully in Defendants' Opposition to Plaintiffs' Motion to

2 Admit Extra-Record Evidence, Dkt. No. 29, Plaintiffs have failed to demonstrate that the 2017

3 BiOp, Dkt. No. 27-2, warrants admission as extra-record evidence under any of the narrowly

4 construed and applied exceptions.  *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir.

5 2005).  However, even assuming, *arguendo*, the Court admits the 2017 BiOp as extra-record

6 evidence,[3] it still does not constitute the "best scientific and commercial data available."  16

7 U.S.C. § 1536(a)(2).  Plaintiffs argue that the 2017 BiOp is necessary to show that the Biological

8 Opinion relied on "old data that inflates the current status of the species."  Dkt. No. 26 at 19.

9 Specifically, Plaintiffs assert that the 2017 BiOp contains a nesting female western Pacific

10 leatherback sea turtle estimate of 562, whereas the Biological Opinion contains a nesting female

11 western Pacific leatherback sea turtle estimate of 2,600.  *Id.* at 18.  According to Plaintiffs, this

12 means the population estimate is "80 percent less" than assumed in the Biological Opinion.  *Id.*

13 However, Plaintiffs' argument is predicated on a fundamental misunderstanding of the difference

14 between the *annual* number of nesting females and the *total* number of nesting females Put simply,

15 Plaintiff is comparing apples to oranges.

16    The 562 estimate in the 2017 BiOp represents the *annual* number of nesting female

17 western Pacific leatherback sea turtles, not the *total*.  Salz Decl. ¶3.  By contrast, the 2,600

18 estimate in the Biological Opinion represents the *total* number of nesting female western Pacific

19 leatherback sea turtles, not the *annual*.  AR 18 at 01043.  Because leatherback "[f]emales nest

20 every one to seven years," depending on foraging success and duration, Dkt. No. 27-2 at 110-11,

21 "the number of annual nesting females represents only those turtles that remigrated to nest in a

22 specific year and represents only a fraction of the total number of nesting turtles in the western

23 Pacific leatherback sea turtle subpopulation" (Salz Decl. ¶3).  Accordingly, Plaintiffs' argument

24 that the 2017 BiOp's population assessment was "80 percent less" than the Biological Opinion is

25 incorrect.

26

27 [3] Should the Court grant Plaintiffs' motion to admit extra-record evidence, Defendants request
that the Court also admit the attached Declaration of Ronald Salz, a co-author of the 2017 BiOp,
28 *see* Exhibit A ("Salz Decl.").

1   Moreover, the 2017 BiOp's estimate of the annual number of nesting female western

2   Pacific leatherback sea turtles is not "superior" to the Biological Opinion.  Both the 2017 BiOp,

3   Dkt. No. 27-2, and the Biological Opinion, AR 18, relied on the same scientific reports and data

4   when estimating the number of *annual* female nesting western Pacific leatherback sea turtles.

5   Salz Decl. ¶3.  Namely, both biological opinions rely on and reference:  (1) the 2013 NMFS and

6   FWS Leatherback Sea Turtle 5-Year Review ("2013 Leatherback Sea Turtle Review") (AR 255);

7   and (2) Tapilatu *et al.* 2013 (AR 152).  *See* AR 18 at 01043, 01111, 01116; Dkt. No. 27-2 at 110-

8   11, 334, 344; *see also* Salz Decl. ¶3.  Thus, Plaintiffs' argument that the Biological Opinion

9   relied on "old" data, Dkt. No. 26 at 19, is without merit since both the biological opinions are

10  predicated on the *same* underlying scientific reports and data.[4]

11      What constitutes the "best" available science implicates core agency judgment and expertise

12  to which Congress requires the courts to defer; a court should be especially wary in overturning such

13  a determination on review.  *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592-93

14  (9th Cir. 2014); *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).  Plaintiffs

15  have failed to demonstrate that the 2017 BiOp should be admitted as extra-record evidence, and even

16  if so, that it constituted the "best" available scientific data.

17
18          **b.  NMFS relied on the best available estimate of average abundance of
            leatherback sea turtles foraging in neritic California waters.**

19      The Biological Opinion appropriately relied on a 2007 Fishery Bulletin article that used

20  aerial surveys from 1990-2003 to estimate that the average number of western Pacific

21  leatherbacks foraging off the coast of California was 178.  Dkt. No. 26 at 19; *see* AR 18 at

22  01079-80 (citing to AR 78, 03044-54).  In support of their argument that the 2007 Bulletin is not

23  the best available science, Plaintiffs cite to a September 2015 email from the same author of the

24  2007 Fishery Bulletin article, Scott Benson, who was working on compiling data from 2005-

25  2014 to estimate a new average number of 54 leatherbacks foraging off the coast of California.

26
27      [4] Lastly, the 562 estimate in the 2017 BiOp represents a conservative estimate of the
    annual number of nesting females.  Salz Decl. ¶4.  Furthermore, sea turtle abundance estimates
    extrapolated from nest counts inherently have a high degree of uncertainty associated with them
28  and thus should be used with caution.  *Id.*

Dkt. No. 26 at 19 (citing AR 362 at J_0000460).  However, the author explicitly stated that this preliminary estimate "remains a work in progress" as he still needed to modify several aspects of his model.  AR 362 at J_0000460.  In particular, he stated that he still needs to apply "the appropriate $g(0)$," which is the probability of detection at zero perpendicular distance estimated from leatherback turtle dive data.  *Id.*; *see also* AR 78 at 03046.  This variable, $g(0)$, plays a critical role in the overall estimate.  AR 78, 03044-54, *see*, *e.g.*, *id.* at 03046-47 ($g(0)$ influences other variables in calculating the average abundance foraging estimate).  Further, the $g(0)$ estimates developed by these studies are the first to be based on dive records of leatherback turtles within a foraging region and, therefore, should be considered critically while further calibration studies are ongoing.  *See* AR 78 at 03051-52.  Given this, and less aerial effort, Benson's new estimate had an elevated coefficient of variation.  AR 362 at J_00000460.  Accordingly, the scientist himself stated that this new estimate is strictly "preliminary" and that it needs to be "subjected to *rigorous* peer review."  AR 362 at J_0000460 (emphasis added).

Despite this warning from the scientist himself, Plaintiffs argue that NMFS acted arbitrarily and capriciously by not including this preliminary, non-peer-reviewed estimate in the Biological Opinion because "'[t]he best . . . scientific data available,' does not mean 'the best scientific data possible.'"  Dkt. No. 26 at 19 (quoting *San Luis & Delta Mendota Water Auth*, 747 F.3d at 602 (citations omitted)).  Plaintiffs' argument is misplaced.  The issue is not whether this preliminary, non-peer-reviewed estimate sent in an informal email steeped in disclaimers was "available," but rather whether it was the "best" estimate.  Simply put:  NMFS appropriately determined it was not the "best" estimate.  This preliminary estimate did not include the updated probability of detection at zero perpendicular distance calculation, which impacts the total abundance estimate.  *See* AR 78 at 03046-47; AR 362 at J_0000460.  Moreover, it was not peer-reviewed, much less "rigorously" as the scientist beseeched.  AR 362 at J_0000460.

"The obvious purpose of the [best available science requirement] is to ensure that the ESA not be implemented haphazardly, on the basis of speculation or surmise."  *Bennett v. Spear*, 520 U.S. 154, 176 (1997).  Here, relying on an estimate that has not been peer-reviewed and is flawed for use in this particularized application, lacking a key variable, would run counter to the best available

1   science requirement and create a biological opinion premised on speculation and inaccurate science.

2   *See Trout Unlimited v. John*, 645 F. Supp. 2d 929, 957 (D. Or. 2007) ("[T]he point of peer reviews"

3   is to determine whether the estimate "ha[s] scientific support and [is] consistent with scientific

4   principles."). NMFS's decision to use the 2007 Fishery Bulletin article, which was peer-reviewed

5   and published, to estimate the average number of western Pacific leatherbacks foraging off the

6   coast of California was proper and is entitled to deference. *San Luis & Delta Mendota Water*

7   *Auth.*, 747 F.3d at 610.

8               **c.   NMFS relied on the best available Hawaii longline observer data.**

9               The Biological Opinion also properly did not incorporate the 2017 Hawaii longline

10  observer data as that data was unavailable at the time the Biological Opinion was written. Plaintiffs

11  disagree and point to the Pacific Islands Longline Quarterly and Annual Report, AR 249 at 12956-

12  57, to show that the 2017 Hawaii deep-set and shallow-set status reports were compiled in February

13  2018, Dkt. No. 26 at 20 n.5. As an initial matter, each status report states the "report is used to

14  ensure prompt dissemination of Hawaii Longline Observer Data and may be revised after final data

15  editing has been completed," thus, denoting that the data used to produce the summary was not

16  considered final when posted. AR 249 at 12956-57 (hyperlinked Hawaii deep-set and shallow-set

17  2017 annual status reports).

18              Moreover, these status reports only show Hawaii longline observer data *summaries*, which do

19  not include the detailed and pertinent information that PRD requested in March 2018. *See* AR 1013

20  at J_00007138-39; AR 1014; AR 1019, AR 1026. Specifically, these summaries cover the entire

21  Hawaii longline fishery wherever the fishing activity occurred, whereas the Biological Opinion's

22  analysis focuses only on fishing east of 140 degrees west longitude. AR 1013 at J_00007139; AR

23  505 at J_00001329-31. In order to separate the data by geographic area, PRD needed the fishing

24  location (latitude and longitude). AR 1013 at J_00007139; *see also* AR 18 at 01033 (describing how

25  and why PRD needed to stratify the Hawaii observer records). Further, for each calendar year, in

26  addition to having to parcel out the observations made in the proper geographic area, each row of raw

27  data would also need to include: "(1) whether it is a deep-set, or shallow-set; (2) species; (3) haul

28  date; (4) begin haul position; and (5) disposition of the animal (i.e., kept/returned alive/returned

1    dead/injured)," as well as total number of hooks observed east of the 140 degrees west longitude

2    separated into deep-set and shallow-set.  AR 1013 at J_00007139; *see also* AR 18 at 01027-28

3    (describing PRD's request for specific Hawaii longline observer information).  This information

4    takes time to be compiled and approved for dissemination outside of the PIRO prior to completion of

5    the Biological Opinion.  *See*, *e.g.*, AR 741 at J_00002749 (December 2016 email noting that "the

6    data for 2015 [was] not available at the time we requested this information from the Pacific Islands

7    Regional Office observer program" and that it will take time to receive and analyze); AR 731 at

8    J_00002683 (noting lag time between request for data from the Hawaii longline observer program

9    and receipt of the data); AR 1026 at J_00007171 (requiring signing of non-disclosure agreement by

10   PRD prior to receipt of data).

11       The record shows that NMFS continuously and vigorously pursued the best available Hawaii

12   longline observer data.  AR 18 at 01027-28; AR 731 ("If you have more recent data, include it.");

13   AR 1019 at J_00007148 (requesting best Hawaii longline observer data).  At the time the Biological

14   Opinion was written, PIRO had only approved and made available the 2016 Hawaii longline

15   observer data.  AR 18 at 01028; AR 1026 at J_00007171 (*only* 2016 Hawaii longline observer data

16   transmitted to PRD on March 28, 2018, *not* 2017).  There is no record evidence showing that PIRO

17   had approved and disseminated the detailed and pertinent information 2017 Hawaii longline observer

18   data that PRD requested in March 2018.  *See generally* AR; *see also* AR 1026 at J_00007171 (only

19   2016 data transmitted).  NMFS carefully considered and incorporated the 2016 Hawaii longline

20   observer data into the Biological Opinion, which was the best available scientific data.  *Am.*

21   *Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008) (the "best available data" standard

22   "requires not only that data be attainable, but that researchers in fact have conducted the tests").

23           **2.      NMFS properly concluded that the EFPs for two vessels for a finite**
24                   **period of two years to conduct exploratory fishing would result in "no**
                     **jeopardy."**
25

26       NMFS Biological Opinion properly concluded that issuance of the EFPs, which permit only

27   two vessels to conduct longline fishing for two years, is not likely to jeopardize the continued

28   existence of the western Pacific leatherback sea turtle.  To reach this "no jeopardy" determination,

NMFS properly aggregated the effects of the "environmental baseline" (AR 18 at 01054-59), the "effects of the action" (AR 18 at  01061-64, 01066-70), and the "cumulative effects" in the action area (AR 18 at 01075-76)—when viewed against the status of the species (AR 18 at 01034-35, 01041-46)—to find that the EFPs are not expected to result in an appreciable reduction in the likelihood of the western Pacific leatherback sea turtle's survival and recovery.  *See* AR 18 at 01033 (describing analytical approach); AR 18 at 01076-77, 01079-81 (describing no jeopardy determination).  Accordingly, NMFS' jeopardy analysis was rational and should be upheld.

Contrary to Plaintiffs' argument that NMFS "violated the ESA by nowhere considering the effects of the longline permit when *combined* with baseline conditions, cumulative impacts and the . . . status of the species," NMFS considered exactly that in the Integration and Synthesis section of the Biological Opinion.  AR 18 at 01076-81.  Indeed, NMFS explicitly notes that it "add[ed] the effects of the action (Section 2.5) to the environmental baseline (Section 2.4) and the cumulative effects (Section 2.6), taking into account the status of the species (Section 2.2) to formulate the agency's biological opinion as to whether the proposed action is likely to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing its numbers, reproduction, or distribution."  AR 18 at 01076.  NMFS noted that the environmental baseline[5] in the action area includes interaction with other fisheries, such as coastal pot/trap and drift gillnet, vessel strikes, entrainment in power plants, interaction with marine debris including plastics, takes through scientific research, and impacts from climate change.  AR 18 at 01054-57, 01080.

NMFS combined this environmental baseline with the effects of the action[6]—i.e., two vessels longline fishing for two years.  *Id.*  Longline fishing gear can interact with sea turtles by hooking or

---

[5]  "Environmental baseline" "includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with consultation process."  50 C.F.R. § 402.02.

[6]  "Effects of action" "refers to the direct and indirect effects of an action on the species . . . , together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline."  50 C.F.R. § 402.02.

1    entangling the turtle—both of which carry the risk of forcible submergence.  *Id* at 01062-64.  Since

2    longline fishing in the action area was previously prohibited, NMFS used fishery-dependent data

3    from both the Hawaii longline fishery (including both shallow-set and deep-set east of 140°W

4    longitude) and the drift gillnet fishery as proxies.  *Id.* at 01033.  Based on the Hawaii longline fishery

5    data, NMFS found that there would be no expected western Pacific leatherback sea turtle interactions

6    with the deep-set longlines, and a 0.8 interaction rate with shallow-set longlines.  *Id.* at 01068, 01080.

7    However, based on historical takes in the Californian drift gillnet fishery, research on leatherback

8    movements, and the time and location the two vessels would be fishing, NMFS increased this

9    estimate to two interactions with western Pacific leatherback sea turtles over the course of the two

10   years.  *Id.*  Using the 22% post-interaction mortality estimates from the Hawaii shallow-set fishery,

11   NMFS anticipated that one of the two interactions may be lethal.  *Id.* at 01069, 01080.  Based on size

12   observance and sex ratios, NMFS assumed that the one mortality over a maximum of two years

13   could be an adult female.  *Id.* at 01070, 01080.  NMFS found no cumulative effects[7] because, besides

14   actions already occurring, there were no further future non-Federal activities in the action area in the

15   next two-years.

16         NMFS qualitatively aggregated the impacts of the all these effects and then properly

17   compared it to the status of the leatherback sea turtle to determine that the two vessels longline

18   fishing for two years is not expected to appreciably reduce the species' chance at continued survival

19   and recovery.  AR 18 at 01080-81.  NMFS found that because if this loss occurs it would come from

20   the Bird's Head peninsula's nesting female western Pacific leatherback sea turtle subpopulation, it

21   would amount to "approximately 0.1 percent of the Bird's Head nesting beach population or 0.03

22   percent of the entire western Pacific nesting populations," which are small fractions of the total

23   population and would have an insignificant effect on the population growth rate.  *Id.* at 01080.

24   NMFS noted that subadult and adult leatherbacks have high reproductive value; therefore, continued

25   protection of nesting beaches should increase reproductive output in relatively short periods of time,

26   as it did in the Caribbean.  *Id.* at 01081; *see also* 50 C.F.R. § 402.02 (jeopardy determination requires

27

28   ───────────────────────
[7]  "Cumulative effects" are "those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area."  50 C.F.R. § 402.02.

1    evaluating whether the action appreciably reduced the likelihood of survival and recovery "*by*

2    *reducing the reproduction, numbers, or distribution of that species*." (emphasis added)).  NMFS

3    found that the longline fishing in the West Coast EEZ would not "impair or limit the western Pacific

4    leatherback subpopulation from becoming more stable or increasing over the long term, nor [did

5    NMFS] anticipate the foraging population to be limited from increasing or stabilizing."  *Id.*  Thus,

6    while properly considering aggregate effects on the western Pacific leatherback sea turtle—including

7    that populations have been declining due "to captures in fisheries and human-caused sources of

8    mortality"—in light of the status of the overall species, NMFS correctly determined that the potential

9    one-time removal of a single adult female from the Bird's Head nesting population may not be

10   detectable, and certainly is not expected to cause a considerable reduction in the species' likelihood

11   of survival and recovery.  *Id.* at 01080-81.  Accordingly, NMFS properly aggregated the

12   environmental baseline, effects of the action, and cumulative effects to reach its "no jeopardy"

13   determination.

14          Plaintiffs rely on *National Wildlife Federation v. National Marine Fisheries Service*, 524

15   F.3d 917 (9th Cir. 2008), and *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 878

16   F.3d 725 (9th Cir. 2017), to support their argument that NMFS' "no jeopardy" determination was

17   arbitrary and capricious.  *See* Dkt. No. 26 at 21-24.  However, both cases are distinguishable.  In

18   *National Wildlife Federation*, the court found that the agency erred by not incorporating "degraded

19   baseline" conditions into its jeopardy analysis.  524 F.3d at 929-30.  Specifically, the agency

20   improperly compared the effects of the action—i.e., dam operations—to the risk posed by baseline

21   conditions, and argued that only if those effects of the action are "appreciably" worse than the

22   baseline must a full jeopardy analysis be made.  *Id.* at 930.  The court rejected this approach and

23   found that the proper assessment is whether the species would be jeopardized by the aggregate of the

24   proposed agency action, the environmental baseline, cumulative effects, in light of the current status

25   of the species.  *Id.*  This is the exact approach employed in this case.  AR 18 at 01076-77, 01079-81.

26   Accordingly, unlike in *National Wildlife Federation*, NMFS applied the correct analytical framework

27   and its jeopardy analysis was neither arbitrary nor capricious.

28          In *Turtle Island Restoration Network*, the court found that the agency made the same

mistake:  it compared the effects of the proposed action to the environmental baseline.  878 F.3d at

737-38.  In *TIRN*, the agency's climate-based model predicted a decline in loggerhead populations to

a level that represented a heightened risk of extinction, and the annual removal of one adult female

loggerhead from the proposed action caused "little or no difference in the extinction risk."  *Id.* at 737.

The court found that this was an impermissible comparison between the "the prospective harm to

loggerheads that is attributable to the proposed action" (i.e., the death of a single adult, female

loggerhead per year), to the environmental baseline (i.e., "the much greater harm resulting from

factors beyond the fishery").  *Id.*  Because the baseline conditions must be factored into the jeopardy

analysis cumulatively with the entirety of agency actions, the Court found that the agency's "no

jeopardy" determination was arbitrary and capricious.  *Id.*  Here, contrary to Plaintiffs' argument,

NMFS did *not* compare the proposed action—i.e., two vessels longline fishing for two years

resulting in a maximum death of a single adult, female Pacific leatherback—*against* the baseline

conditions—i.e., interaction with other fisheries, vessel strikes, entrainment in power plants,

interaction with marine debris including plastics, takes through scientific research, and impacts from

climate change.  Instead, NMFS considered the proposed action *together with* the baseline

conditions.  AR 18 at 01076-77, 01079-81.  NMFS then properly compared the status of the

leatherback sea turtle species against these aggregated effects to determine that two vessels longline

fishing for two years in the West Coast EEZ would not reduce appreciably the species' chance at

continued survival and recovery.  *Id.*  Unlike in *National Wildlife Federation* and *TIRN*, NMFS

properly compared the agency action *together with* the baseline conditions to determine that the

leatherback sea turtle's likelihood of survival and recovery were not expected to appreciably reduce.

Accordingly, NMFS properly made a "no jeopardy" determination, and this Court owes that

determination deference.  *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) ("Review

under the arbitrary and capricious standard is narrow and we do not substitute our judgment for that

of the agency" (citation omitted)).

Notably, the court in *TIRN* found that the agency's determination—that the Hawaii longline

fishery was not likely to jeopardize leatherback sea turtles—was proper.  878 F.3d at 739.  In *TIRN*,

the biological opinion projected 26 interactions and 4 deaths of adult, female Pacific leatherbacks

1    each year.  *Id.* at 732, 736.  Given that the court found that a proposed action resulting in those take

2    levels, which would occur *each* year, was not expected to appreciably reduce the Pacific

3    leatherbacks' likelihood of survival and recovery, Plaintiffs are hard-pressed to argue why this one-

4    time EFP that authorizes only two vessels to fish over two years with a limit of one leatherback

5    mortality (with 100% observer coverage) would "tip [the western Pacific leatherback sea turtle] from

6    a state of precarious survival into a state of likely extinction."  *National Wildlife Federation*, 524

7    F.3d at 930.

8        Also meritless is Plaintiffs' argument that NMFS "has made no rational connection between

9    the relevant facts and its finding that the [EFPs are] not likely to result in jeopardy of leatherback sea

10   turtles."  Dkt. No. 26 at 24.  As demonstrated above, NMFS carefully evaluated the status of the

11   species in light of the aggregated environmental baseline, effects of the action, and cumulative effects

12   to properly make its no jeopardy determination.  The Biological Opinion also makes clear that only

13   *western* Pacific leatherback sea turtles—not *eastern* Pacific leatherback sea turtles—are present in

14   the action area.  AR 18 at 01044, 01069, 01080.  Thus, to the extent that Plaintiffs rely on statements,

15   assessments, and statistics related to the *eastern* Pacific leatherback, these arguments should be

16   disregarded as not germane to this case, which only impacts western Pacific leatherbacks.  *See*, *e.g.*,

17   Dkt. No. 26 at 22 (citing AR 18 at 01043 for the proposition that Pacific leatherbacks are on the

18   "verge of extirpation," but this was referring to *eastern* Pacific leatherbacks); *see also* Dkt. No. 26 at

19   11 n.1 (recognizing that the western Pacific leatherback sea turtles subpopulation is the only

20   subpopulation at issue in this case).  In contrast with the *eastern* Pacific subpopulation, there is still

21   "hope" that the western Pacific subpopulation—despite its decline—"is still large enough that it

22   could recover if effective management measures can be implemented."  AR 152 at 05308.

23       In the same vein, the record evidence shows that there are some positive trends when it

24   comes to the western Pacific leatherback sea turtles' survival and recovery.  There has been

25   significant outreach and community support to improve nesting beach protections.  AR 258 at 13497.

26   For example, there is a management program at Jamursba Medi and Wermon that has included

27   small-scale hatcheries and relocation of doomed nests to maximize hatchling production at Bird's

28   Head nesting beaches.  AR 152 at 05308.  There is also an intensive and collaborative effort between

1    conservation organizations and the communities; "villagers now participate side-by-side with

2    biologists to patrol the beaches, maximize hatchling productive, and protect in situ nest and nesting

3    females." *Id.*  The local community members' dedication is further evidenced by their request that a

4    road be re-routed to avoid coastal development.  *Id.* at 05308-09; AR 258 at 13495.  And while this

5    may just pertain to one location, Bird's Head Peninsula in Indonesia supports 75% of the western

6    Pacific leatherback sea turtle subpopulation and thus could have far-reaching implications on the

7    survival and recovery of the subpopulation.  *See* AR 18 at 01081 (NMFS found that subadult and

8    adult leatherbacks have high reproductive value; therefore continued protection of nesting beaches

9    should increase reproductive output in relatively short periods of time).  There have also been new

10   advancement and modifications in longline fishing gear that has proven to reduce leatherback

11   bycatch rates by 84%.  AR 18 at 01031 (citing AR 151 & 168).  So far, this has been employed

12   domestically, but could have large implications if adopted by international longline fisheries.

13   Also "on a positive note" new, previously unknown nesting locations in Indonesia, have been

14   recently discovered.  AR 18 at 01079.

15        Plaintiffs' motion repeatedly cites to a NMFS bycatch report for the Pacific Coast

16   groundfish fisheries stating that "every turtle counts."  Dkt. No. 26 at 12, 17, 20, 21, 27, 30, 32

17   (citing AR 1038 at J_00007320).  Standing alone this phrase could imply that no further takes

18   should be permitted; however, when taken in proper context, this statement was referring to the

19   reasonable and prudent measures that should be employed to reduce the interactions and deaths

20   of bycaught Pacific leatherback turtles for a biological opinion that authorized takes.  AR 1038 at

21   J_00007307, J_00007320 ("every turtle counts . . . [t]herefore, for rare but not negligible

22   instances of interactions, some measures are necessary to reduce deaths of bycaught turtles").

23   Moreover, this is not the statutory or regulatory standard in assessing jeopardy.  The question is

24   not whether the action is expected to reduce a species, but rather whether it is expected to

25   "reduce *appreciably*" that species' likelihood of survival and recovery.  50 C.F.R. § 402.02.

26   "Appreciably" means to "considerably" or "materially" reduce.  *See Oceana v. Pritzker*, 75 F.

27   Supp. 3d 469, 482 (D.D.C. 2014).  The leatherback is endangered, which by definition means it

28   is a "species which is in danger of extinction."  16 U.S.C. § 1532(6).  If the ESA prohibited any

1  action that worsened—no matter how marginally—a species' current plight, then no action

2  would survive Section 7 consultation.  In sum, NMFS acted rationally when it applied the proper

3  analytical framework to conclude that the EFPs, which authorized two fishing vessels to fish for

4  two years with a hard cap of one lethal take of an adult, female western Pacific leatherback (with

5  100% observer coverage), would not "reduce appreciably" the subpopulation.  This determination

6  should be afforded deference.  *Lands Council*, 629 F.3d at 1074.

7      **B.**      **NMFS'S EA COMPLIED WITH NEPA.**

8          **1.**      **NMFS Considered A Reasonable Range Of Alternatives Consistent**
9                  **with the Purpose and Need of the Project, Thereby Satisfying NEPA.**

10         The Court should reject Plaintiffs' NEPA claims.  NMFS reasonably rejected alternatives

11  that were outside the scope.  Plaintiffs object to the selection of the proposed action as arbitrary

12  and capricious by alleging that NMFS failed to consider and analyze the full range of reasonable

13  alternatives, particularly those that would mitigate impacts to leatherback sea turtles.  Dkt. No.

14  26 at 19  Specifically, they argue that NEPA requires NMFS to consider alternatives that require

15  the permitees (1) to avoid the Pacific Leatherback Conservation Area ("PLCA"), or (2) to use

16  EcoCast, a tool designed to predict the location of leatherback sea turtles.  *Id*.  However, NMFS

17  complied with NEPA by considering alternatives that were within the scope of the EFP, and

18  reasonably rejected alternatives that were outside the scope.

19         "[A]n agency's obligation to consider alternatives under an EA is a lesser one than under

20  an EIS."  *Native Ecosystems Council*, 428 F.3d at 1246.  When preparing an EA, agencies are

21  only required to conduct brief discussions of reasonably feasible alternatives that are reasonably

22  related to the purpose of the project. *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376

23  F.3d 853, 868 (9th Cir. 2004) (citing *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174,

24  1181 (9th Cir. 1990).  An agency need not consider alternatives that are "unlikely to be

25  implemented or [are] inconsistent with its basic policy objectives."  *Seattle Audubon Soc'y v.*

26  *Moseley*, 80 F.3d 1401, 1404 (9th Cir. 1996) (citations omitted).

27         Here, the purpose and need of the EFP is to explore alternative economically feasible

28  fishing techniques in the U.S. West Coast Highly Migratory Species Fishery, acknowledging that

1  the fishery is declining largely due to the attrition of participants using drift gillnet gear, and to

2  assess the type and extent of interactions with protected species and non-target fish.  AR 1 at

3  00013-00014.  Therefore, NEPA required NMFS to explore a range of alternatives that would

4  address the economic feasibility of using longline gear in a manner that would also generate

5  information on interactions with listed species and means for mitigating those impacts.  For

6  example, Section 2.1.2.1 of the EA provides a detailed explanation of how the preferred

7  alternative responds directly to achieving the stated purpose and need.  AR 1 at 00021-00023.

8  This includes gathering information on the feasibility of using the specified gear types subject to

9  terms and conditions; the need to avoid unacceptable levels of interactions with protected species

10  (i.e., the purpose of each term and condition); and the likelihood that the effort will generate

11  information useful to future management decisions.  *Id.*

12        Plaintiffs ignore that NMFS built avoidance and minimization measures into the

13  proposed action; i.e. limiting fishing within 50 nautical miles of mainland shores and islands and

14  closing the southern California Bight and Leatherback critical habitat to minimize interactions

15  with protected species - specifically leatherback sea turtles.  AR 1 at 00023.   In addition, NMFS

16  built all known practicable mitigation measures into the proposed action:

17
18  > measures such as use of circle hooks and mackerel-type bait, fishery closures
   > based on sea turtle interaction limits, area restrictions, proper handling of hooked
19  > and entangled turtles, and use of disentangling and de-hooking equipment along
   > with 100 percent observer coverage would be employed under Alternative 2.

20  AR 1 at 00104.  Moreover, there is hard stop of fishing under the EFP if there is a single

21  observed mortality of a leatherback.  AR 1 at 00105.

22        Although Plaintiffs suggest other measures that could potentially be fashioned into

23  "meaningful" alternatives, their complaints about the range of alternatives considered by the

24  NMFS should be rejected.  First, Plaintiffs argue that it was arbitrary and capricious for the

25  NMFS not to include an alternative in which the PLCA remained closed to longline fishing for

26  the "fall months."  Dkt. No. 26 at 28.  This misconstrues the record – the NMFS did take a hard

27  look at whether to require such a closure.   The PLCA is an area off the California coast

28

1    extending out to the EEZ in which setting, hauling, or fishing with DGN gear is prohibited from

2    August 15th to November 15th each year.  AR 57 at 02007.  Plaintiffs first cite to a memorandum

3    by the Assistant Regional Administrator for Sustainable Fisheries, recommending that while

4    NMFS did not anticipate significant impacts to leatherbacks due to the EFP, on account of their

5    sensitivity to public concern for leatherbacks, they recommended that the terms and conditions of

6    the EFP encourage permit holders to refrain from fishing in the PLCA during the closure period

7    in the first year of the EFP.  *Id.*  Accordingly, the terms and conditions of the permits themselves

8    includes the recommendation that "fishermen be aware of the boundaries of the [PLCA] and

9    avoid setting gear from August 15 through November 15 of each year in the area…."  AR 52 at

10   01902.  Plaintiffs' second citation refers to the seasonal closure in the Hawaii longline fishery as

11   discussed in the BiOp.  Dkt. No. 26 at 28.  However, as discussed above in Section V.A., the

12   BiOp concluded that even if the vessels associated with the EFP fished within the PLCA during

13   the drift gillnet closure period, the EFP is "not likely to appreciably reduce the likelihood of both

14   the survival and recovery of this species."  AR 18 at 01081.

15          Second, Plaintiffs argue that it was arbitrary and capricious for NMFS not to consider a

16   separate alternative requiring the use of EcoCast.  Dkt. No. 26 at 28.  EcoCast is a dynamic

17   ocean modeling tool in development for use along the United States West Coast that is expected

18   to predict the spatial distribution of both protected species and target stocks for fisheries in near

19   real-time.  AR 1 at 00116.  NMFS acknowledges in its cumulative impacts analysis that this

20   technology is developing, and may in the future be used to create an "incremental" benefit by

21   predicting potential undesirable interactions.  *Id.*   This alone though is insufficient to serve as a

22   separate alternative to sharply compare and contrast effects among alternatives.  Moreover, the

23   permit itself requires the EFP fishermen to take training on the use of EcoCast, recommends that

24   EFP fishermen consult EcoCast before setting their lines, and if the expected presence of

25   leatherbacks is indicated, they are encouraged to assess the risks and refrain from fishing in the

26   area.  AR 52 at 01903.

27          The record shows that NMFS built all known effective mitigation measures into the

28   proposal under the preferred alternative, and there were essentially no additional reasonable

1    mitigation alternatives available for consideration.  AR 1 at 00019-00023.  By comparing the no

2    action alternative (no fishing) to the preferred alternative (fishing subject to rigorous mitigation),

3    NMFS and the public saw a clear picture of the effects of the action on protected species.

4    *Westlands Water Dist.*, 376 F.3d at 871-72 ("The touchstone . . . is whether an EIS's selection

5    and discussion of alternatives foster informed decision-making and informed public

6    participation." (citation and quotation marks omitted).  The alternatives suggested by Plaintiffs

7    would not add meaningfully to the understanding of such impacts.

8
         **2.    NMFS Complied With NEPA By Conducting A Reasonable
9               Cumulative Impacts Analysis.**

10        NMFS properly assessed the cumulative impacts of the EFP on leatherbacks turtles.  An

11   EA must analyze the cumulative impacts of the proposed action.  *Bering Strait Citizens for*

12   *Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 954 (9th Cir. 2008).  A

13   "cumulative impact" is defined in CEQ's NEPA regulations as "the impact on the environment

14   which results from the incremental impacts of the action when added to other past, present, and

15   reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or

16   person undertakes such other actions."  *Mont. Wilderness Ass'n. v. Connell*, 725 F.3d 988, 1001

17   (9th Cir. 2013) (quoting 40 C.F.R. § 1508.7).  The analysis of cumulative effects should include

18   "some quantified or detailed information that results in a useful analysis."  *Ctr. for Envtl. Law &*

19   *Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th Cir. 2011) (citation and

20   quotation marks omitted).

21        NMFS appropriately considers and discusses cumulative impacts, including the effect of

22   the EFP on sea turtles.  AR 3 at 00415-00419, AR 6 at 00619.  The EA concludes that "[o]verall,

23   the incremental effects of the action alternatives are very small relative to baseline levels, and

24   cumulative effects are not expected to be significant."  AR 1 at 00119.  NMFS discusses

25   potential cumulative impacts to sea turtles from the multiple fisheries in the relevant geographic

26   area by examining the specific number of turtles observed taken in the past in each of the

27   examined fisheries.  AR 1 at 00119-00120.  NMFS also examined the number of sea turtles taken

28   due to power plant entrapment, scientific research, and vessel collisions.  AR 1 at 00120.

1   Plaintiffs argue that NMFS violated NEPA by failing to estimate leatherback sea turtle mortality

2   from ship strikes in its cumulative impacts analysis.  Dkt. No. 26 at 30.  But NMFS

3   acknowledges this and other issues and explained any impacts would be minimal.  Moreover, the

4   Biological Opinion's analysis of current populations of sea turtles provides the baseline data

5   needed for a cumulative impacts analysis.  *See* AR 18.  This satisfied NEPA.  *See Bark v. U.S.*

6   *Bureau of Land Mgmt.*, 643 F. Supp. 2d 1214, 1223-24 (D. Or. 2009) (noting that EA does not

7   require a "cataloguing of all past present and foreseeable projects by listing the time, type, place,

8   scale, different plans and methods, without regard to the usefulness of the data," and "when the

9   analysis concludes that the project will have virtually no effect on cumulative impacts, it is

10  unnecessary for the agency to detail other actions." (citation omitted)).

### 3.       An EIS Is Not Required.

12          An agency is only required to conduct an EIS if the proposed action will significantly

13  affect the human environment. 42 U.S.C. § 4332(2)(C).  Based on the EA, NMFS properly

14  concluded that the proposed action would not significantly alter the status quo, and thus would

15  not have a significant impact on the environment necessitating the preparation of an EIS.  *See*

16  *Tri-Valley CAREs v. U.S. Dept. of Energy*, 671 F.3d 1113, 1125 (9th Cir. 2012) ("If the proposed

17  action does not significantly alter the status quo, it does not have a significant impact under

18  NEPA." (citation omitted)).  Plaintiffs challenge this analysis, citing various "intensity" factors

19  set forth at 40 C.F.R. § 1508.27 to argue that NMFS is required to conduct an EIS.  But their

20  arguments fail to raise "substantial questions whether [the proposed action] may have a

21  significant effect" on the environment, and thus fail to demonstrate that a detailed EIS is required

22  under NEPA.  *Cf. Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1212 (9th

23  Cir. 1998).

24          The courts standard of review is "quite narrow."  *Akiak Native Cmty. v. U.S. Postal Serv.*,

25  213 F.3d 1140, 1146 (9th Cir. 2000) (upholding an EA and FONSI, while "[m]indful of the

26  limited scope of our review").  An agency's determination that a particular effect is insignificant

27  will generally be "a classic example of a factual dispute the resolution of which implicates

28  substantial agency expertise."  *WildEarth Guardians v. Provencio,* 923 F.3d 655, 672 (9th Cir.

1  2019) (quoting *Marsh v. Or. Nat Res. Council*, 490 U.S. 360, 376 (1989)).  Here, the NMFS

2  applied its expertise and appropriately concluded that no EIS was required under the pertinent

3  standard.

4  Notably, Plaintiffs do not dispute NMFS' prediction of the interactions with sea turtles.

5  What they disagree with is NMFS's conclusion as to the intensity of the effect.  NMFS found

6  that leatherback sea turtles may experience minor adverse effects under this alternative through

7  hooking or entanglement in longline fishing gear.  Given the measures included to reduce the

8  likelihood of such adverse effects, the relatively small short-term increase in total longline effort

9  and catch, and the 100 percent observer coverage included in the preferred alternative, any

10  potential increase in leatherback sea turtle interactions under this alternative is not expected to

11  have a significant effect on the health of leatherback sea turtle populations.  AR 1 at 00281-002

12  82; AR 18 at 01081.  NMFS believes most interactions will be minor and short-term, with one

13  mortality likely.  AR 18 at 1081.  If there is a mortality, fishing effort must halt.  AR 1 at 00024.

14  Relying on the informed expertise of its career scientists, NMFS believes that the single

15  mortality will not result in population level effects; Plaintiffs simply disagree

16
17  ### a.   NMFS Properly Examined the Impact of the EFP on Leatherback Turtles.

18  NMFS properly considered the degree to which the proposed the proposed action may

19  impact endangered species.  40 C.F.R. § 1508.27(b)(9).  Plaintiffs are incorrect that the NMFS

20  did not adequately examine the impact of the EFP on leatherback turtles.  Dkt. No. 26 at 31.  As

21  discussed above in Section V.A., NMFS properly analyzed impacts to leatherback turtles in the

22  Biological Opinion, and the chosen alternative includes a number of measures meant to mitigate

23  the number and severity of interactions with leatherbacks.  AR 1 at 00019-00024, AR 2 at 00292.

24  ### b.   NMFS Adequately Considered Whether the Effects of the EFP Are Highly Controversial.

25  An action is only "highly controversial" under NEPA regulation when a "substantial

26  dispute exists as to the size, nature, or effect of the major federal action."  *Humane Soc'y of the*

27  *U.S. v. Locke*, 626 F.3d 1040, 1057 (9th Cir. 2010). "'Controversial' refers to disputes over the

1  size or effect of the action itself, not whether or how passionately people oppose it." *Wild*

2  *Wilderness v. Allen*, 871 F.3d 719, 728 (9th Cir. 2017) (citation omitted).  Plaintiffs claim that

3  the California Coastal Commission's ("CCC") request to review the EFP's effects on the

4  California coastal zone's marine resources under the Coastal Zone Management Act's federal

5  consistency provision illustrates the "controversy" over the EFP's effect on leatherbacks.  Dkt.

6  No. 26 at 32.  It does not.  NOAA' Office for Coastal Management ("OCM") denied the CCC's

7  request to review the EFP, because they found that the CCC had not established that the potential

8  impacts of the proposed EFP would have "reasonably foreseeable effects on the uses or resources

9  of the California coastal zone."  AR 37 at 001332.  OCM explained that the CCC did not support

10  their contention that Pacific leatherback migrating through the proposed project area, 50 to 20

11  nautical miles offshore, are resources of California's coastal zone.  AR 2 at 00293; AR 37 at

12  01330.  This shows that to the extent there was any "controversy," it was with regard to what are

13  considered California's coastal resources, and therefore within the jurisdiction of the CCC, not

14  on the actual impacts to leatherback turtles.

15
16  **c.  NMFS Adequately Considered Whether the EFP Violated California
          State Law.**

17          In conducting an EA, NEPA requires the federal agency to "consider," *inter alia*,

18  "[w]hether the action threatens a violation of Federal, State, or local . . . law[.]"  40 C.F.R. §

19  1508.27(b)(10).  Plaintiffs allege that the EFP will (1) violate the California Fully Protected

20  Mammal statute by causing the incidental take of a Guadalupe fur seal; (2) violate California law

21  that "effectively prohibited longline fishing in the EEZ off California."  AR 1 at 00024-00025.

22  The NMFS considered these factors when analyzing the EFP.  With respect to interactions with

23  Guadalupe fur seals, NMFS calculated an interaction rate of 0.0003546 animals per 1,000 hooks,

24  which rounds to zero, and concluded that no Guadalupe fur seal interactions are likely to result

25  from the EFP.  AR 6 at 00617.  The Biological Opinion did conclude that it would "not be

26  unreasonable to assume that the EFP fishery may take up to one Guadalupe fur seal" over the

27  two year period.  AR 1 at 00056.  But, this estimate that the EFP fishery *may* take up to one

28  Guadalupe fur does not necessarily lead to a conclusion that a violation of the California Fully

Protected Mammal statute is likely.  Moreover, the case cited by Plaintiffs *Ctr for Biological Diversity v. Dep't of Fish & Wildlife*, 62 Cal. 4th  204, 234 (2015), is a California state case concerning a violation of state standards.  Here, the NMFS has jurisdiction over regulation of a federal fishery operating in federal waters, and the federal Marine Mammal Protection Act (16 U.S.C. § 1362(13)) preempts states from enforcing any state law "relating to the taking of any species of marine mammal within the state."  *UFO Chuting of Hawaii, Inc. v. Young,* 327 F.Supp. 2d 1220, 1223 (D. Haw. 2004).

The NMFS also considered whether the EFP would violate California's general prohibition of its vessels from fishing with longlines in the EEZ or landing fish harvested in the EEZ with longlines.  AR 2 at 00293.  The NMFS concluded that California's management authority is limited to vessels registered in the State, provided that State requirements are consistent with any Fishery Management Plan and Federal Regulations.  *Id.*  Since EFPs are authorized under the Highly Migratory Species Fishery Management Plan, California-registered fishing vessels would not violate the State prohibitions on longline fishing.  *Id.*

### d.  NMFS Adequately Considered Cumulative Impacts to Leatherback Turtles.

Plaintiffs reiterate their argument that the NMFS failed to adequately consider cumulative impacts to leatherback turtles in its analysis.  Dkt. No. 26 at 34.  As discussed above in Section V.B.2, Plaintiffs are wrong.  The final sufficiently EA examined past and present activities that contribute to the impacts of the proposed action.  AR 2 at 00292.

### C.  BECAUSE NMFS ISSUED THE TWO EFPs IN COMPLIANCE WITH ALL APPLICABLE LAWS, IT DOES NOT VIOLATE THE MSA.

The MSA requires that all fishery management plans and implementing regulations be consistent with the ten national standards set out in the MSA and "any other applicable law."  16 U.S.C. §§ 1851(a), 1853(a)(1)(C).  An EFP allows "the target or incidental harvest of species managed under a FMP or fishery regulations that would otherwise be prohibited" for limited reasons such as testing, data collection, and exploratory fishing.  50 C.F.R. § 600.745(b).  For the above reasons, NMFS issuance of the two EFPs complied with the ESA, NEPA, and APA.

1   Accordingly, NMFS did not violate the MSA.

2   **VI.**   **CONCLUSION**

3        For all the foregoing reasons, the Court should deny Plaintiffs' motion for summary

4   judgment and grant Federal Defendants' cross-motion.

Dated:  October 10, 2019

Respectfully submitted,

JEAN E WILLIAMS, Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SETH M. BARSKY, Chief
MEREDITH L. FLAX, Assistant Chief

  /s/ *Briena L. Strippoli*
BRIENA L. STRIPPOLI, Trial Attorney
MD Bar No. 0612130372
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0339 (t.) | (202) 305-0275 (f.)
Briena.Strippoli@usdoj.gov

  /s/ *Jessica Held*
JESSICA HELD, Trial Attorney
Natural Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0575 (t.) | (202) 305-0506 (f.)
Jessica.Held@usdoj.gov

***Attorneys for Defendants***

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

CENTER FOR BIOLOGICAL DIVERSITY, and
TURTLE ISLAND RESTORATION
NETWORK,

     Plaintiffs,

     v.

WILBUR ROSS, in his official capacity as
Secretary of Commerce, and NATIONAL
MARINE FISHERIES SERVICE,

     Defendants.

Case No. 4:19-cv-03135-KAW

**CERTIFICATE OF SERVICE**

     I hereby certify that, on October 10, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.  I further certify that all participants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Jessica M. Held*
Jessica M. Held