UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WILBUR ROSS, et al.,<br><br>Defendants. | Case No. 4:19-cv-03135-KAW<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 26, 34 |

On September 12, 2019, Plaintiffs, Center for Biological Diversity and Turtle Island Restoration Network, filed a motion for summary judgment, in which they challenge the National Marine Fisheries Service's issuance of permits to allow commercial longline fishing in federal waters off the coast of California. On October 10, 2019, Defendants, Wilbur Ross, in his official capacity as Secretary of Commerce, and the National Marine Fisheries Service, filed a cross-motion for summary judgment.

On December 19, 2019, the Court held a hearing, and after careful consideration of the parties' arguments and the applicable legal authority, for the reasons set forth below, GRANTS Plaintiffs' motion for summary judgment, and DENIES Defendants' cross-motion for summary judgment.

## I. BACKGROUND

**A. Statutory Framework**

    **i. Endangered Species Act**

The Endangered Species Act ("ESA") provides for the conservation of fish, wildlife, and plant species that are at risk of extinction by requiring federal agencies to ensure that actions they authorize, fund, or carry out are "not likely to jeopardize the continued existence" of any ESA-

listed species. 16 U.S.C. § 1536(a)(2). Agencies proposing actions that may affect an ESA-listed species must consult with either the National Marine Fisheries Service ("NMFS" or "Fisheries Service") or the U.S. Fish and Wildlife Service ("FWS") —depending on the species involved— which then reviews the proposed action and prepares a "biological opinion" (or "BiOp") that evaluates whether and the extent to which the action may impact the species. *Id.* § 1536(b); 50 C.F.R. § 402.12. In completing its analysis, NMFS must use "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The ESA's regulations define to "jeopardize the continued existence of" as "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. To prepare its biological opinion, NMFS must evaluate the current status of the species overall and in the action area, the environmental baseline, and the effects of the action and cumulative effects on the listed species in the action area. 50 C.F.R. § 402.14(g)(2) & (3). The jeopardy analysis consists of a synthesis of the effects of the action within the action area upon the status of the species as a whole, taking into account the environmental baseline and cumulative effects. 50 C.F.R. § 402.02.

If NMFS or FWS concludes that an action is likely to cause "jeopardy," then it must propose a "reasonable and prudent alternative" to the proposed action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). On the other hand, if the NMFS or FWS finds that the proposed action would not jeopardize any species' continued existence, it issues a statement permitting the "taking" of a particular number of protected animals "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). That "incidental take statement" ("ITS") must describe the effect of the incidental taking on the species and set forth those reasonable and prudent measures ("RPMs") that NMFS considers "necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(C)(ii). "[A]ny taking that is in compliance with the terms and conditions specified in a written [ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

//

### ii. National Environmental Policy Act

The National Environmental Policy Act ("NEPA") "is a procedural statute that requires the federal government to carefully consider the impacts of and alternatives to major environmental decisions." *Native Ecosystems Council v. Weldon,* 697 F.3d 1043, 1051 (9th Cir. 2012) (citing 42 U.S.C. §§ 4321, 4331). NEPA has "twin aims. First, it places upon [a federal] agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (alteration in original) (internal quotation marks and citation omitted). "NEPA requires agencies to take a 'hard look' at the environmental consequences of proposed agency actions before those actions are undertaken." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1215 (9th Cir. 2017) (citation omitted).

To meet these twin aims, NEPA requires that an agency prepare a comprehensive Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3. Not every federal action or proposal requires preparation of an EIS. Where the environmental impacts of an action are less than "significant," an agency may comply with NEPA though preparation of an environmental assessment ("EA") and a Finding of No Significant Impact ("FONSI"). *See* 40 C.F.R. §§ 1501.3; 1501.4(c), (e); 1508.9.

An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]." *Dep't of Transp. v. Pub. Citizen*, 541 U.S.752, 757 (2004) (quoting 40 C.F.R. § 1508.9(a)(1)). If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a FONSI, which briefly presents the reasons why the proposed agency action will not have a significant impact on the environment. *Id.* at 757-58; 40 C.F.R. §§ 1501.4(e), 1508.13.

"The NEPA process involves an almost endless series of judgment calls," and "the linedrawing decisions necessitated by the [NEPA process] are vested in the agencies, not the

courts. *Duncan's Point Lot Owner's Ass'n v. FERC*, 522 F.3d 371, 376 (D.C. Cir. 2008) (quotations omitted). "NEPA's goal is satisfied once … information is properly disclosed; thus, NEPA exists to ensure a process, not to ensure any result." *Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 758 (9th Cir. 1996) (citation omitted).

### iii. Magnuson-Stevens Fishery Conservation and Management Act

In response to concerns about overfishing, the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") was enacted "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States. . ." and "to promote domestic, commercial, and recreational fishing under sound conservation and management principles. . . ." 16 U.S.C. § 1801(b)(1), (3). The MSA created a comprehensive system for the conservation and management of domestic marine fisheries by establishing eight regional fishery management councils that are responsible for preparing fishery management plans for fisheries subject to the statute. 16 U.S.C. §§ 1801(b)(1), 1852(h). The councils are composed of Federal, State, and territorial fishery management officials, participants in commercial and recreational fisheries, and other individuals with scientific experience or training in fishery conservation and management. 16 U.S.C. § 1852(b). All fishery management plans and implementing regulations must be consistent with the ten national standards set out in the MSA and any other applicable law. 16 U.S.C. §§ 1851(a), 1853(a)(1)(C). If a target or incidental harvest of species managed under a fishery management plan or fishery regulations is prohibited, the NMFS Regional Administrator or Director may authorize an Exempted Fishing Permit ("EFP") "for limited testing, public display, data collection, exploratory fishing, compensation fishing, conservation engineering, health and safety surveys, environmental cleanup, and/or hazard removal purposes." 50 C.F.R. § 600.745(b).

### B. Factual Background

Plaintiffs challenge the Fisheries Service's issuance of an exempted fishing permit ("EFP") that would allow two vessels to engage in commercial longline fishing in the West Coast Exclusive Economic Zone ("EEZ") for a period of two years. (Dkt. No. 1; AR 50-51.) Plaintiffs contend that the agency's issuance threatens the survival and recovery of Pacific leatherback sea

4

turtles and other endangered species. *See ids.*

"Longline" fishing is a commercial fishing method that involves setting a single, horizontal mainline to which shorter branchlines are attached at intervals each ending in a single, baited hook. AR 18 at 01028-29. Shallow-set longlines are typically set at less than 328 feet to target swordfish, and deep-set longlines are typically set at approximately 984-1,312 feet to target tuna. *Id.* at 01029. Longline fishing is banned within 200 miles off the West Coast under federal regulations and state law to ensure the protection of sea turtles. 50 C.F.R. § 660.712; Cal. Fish & Game Code § 9028. The Fisheries Service enacted the federal prohibitions in 2004 to continue "the *de facto* longline prohibition throughout the U.S. EEZ by states' regulations and minimize[] potential bycatch of fish and protected species." 69 Fed. Reg. 18,444, 18,450 (Apr. 7, 2004) (codified at 50 C.F.R. § 660.712(a)).

Leatherback sea turtles off the West Coast of the United States have the largest range of any living reptile and migrate hundreds, and often thousands, of miles across the Pacific Ocean to feed on jellyfish. 77 Fed. Reg. 4,170, 4,171 (Jan. 26, 2012); AR 46 at 01860, 01863. In 2001, the Fisheries Service established the Pacific Leatherback Conservation Area ("PCLA") off the coasts of central California and Oregon. 50 C.F.R. § 660.713(c); AR 61 at 02156. The PCLA consists of 213,000 square miles of the EEZ and bans drift gillnet fishing from August 15 to November 15 annually to protect leatherbacks when they are typically present and foraging off the West Coast. 50 C.F.R. § 660.713(c); AR 61 at 02156. The Fisheries Service decided to close this area to gillnet fishing because doing so was necessary "to avoid the likelihood of the. . . fishery jeopardizing the continued existence of the leatherback sea turtle." 66 Fed. Reg. 44,549 (Aug. 24, 2001) (codified at 50 C.F.R. § 660.713(c)).

In 2015, the Pacific Fishery Management Council recommended that NMFS authorize two EFPs to two vessels for a period of two years to allow exploratory longline fishing to gauge impacts, determine whether this type of fishing is economically viable, assess the type and extent of interactions with protected species, and test mitigation measures appropriate to minimize adverse environmental impacts. Final Environmental Assessment ("EA") AR 1 at 00013-14; 2018 Biological Opinion ("2018 BiOp"), AR 18 at 01026. NMFS accepted public comment on the

5

EFPs. EA, AR 1 at 00015; 2018 BiOp, AR 18 at 01026. In December 2016, NMFS Sustainable Fisheries Division ("SFD") requested formal consultation with NMFS Protected Resources Division ("PRD"). 2018 BiOp, AR 18 at 01026. Initiation of formal consultation commenced once further information had been provided, resulting in a July 2018 Biological Opinion on "Consideration of an Exempted Fishing Permit to Fish with Longline Gear in the West Coast Exclusive Economic Zone" ("2018 BiOp"). AR 18 at 01027-01028.

At the same time NMFS was considering allowing longline fishing in the EEZ, it was also considering sea turtle conservation efforts. On December 21, 2017, NMFS issued an opinion titled "Biological and Conference Opinion on the Proposed Implementation of a Program for the Issuance of Permits for Research and Enhancement Activities on Threatened and Endangered Sea Turtles Pursuant to Section 10(a) of the Endangered Species Act" ("2017 BiOp"). 2017 BiOp, Dkt. No. 27-2. The 2017 BiOp estimated that the Pacific leatherback population has declined from an estimated 81,000 individuals to less than 3,000 total adult and subadult turtles. 2017 BiOp at 108. The opinion estimated that the counts of leatherbacks at nesting beaches indicate a decline "at a rate of almost six percent per year since 1984." *Id.* NMFS attributes this steep decline, in part, to fisheries bycatch, which it identifies as one of three "primary threats." *Id* at 109.

On April 19, 2019, NMFS issued a Final Environmental Assessment and finding of no significant impact ("FONSI"), such that no environmental impact statement ("EIS") for the EFPs was required. Final Environmental Assessment, "EA," AR 1 at 00276-84. As a result, in May 2019, NMFS issued two EFPs to two vessels to conduct exploratory longline fishing for the limited period of two years, active upon signature of the fishermen. *See* AR 50-51. The Fisheries Service estimates that fishing under the permit from these two vessels will entail the use of 330,000 hooks in the area. 2018 BiOp, AR 18 at 01029. In the 2018 BiOp, the Fisheries Service found that fishing under the permit would result in the hooking or entanglement of two female Pacific leatherback sea turtles, one of which would result in the death of the animal; and the hooking or entanglement of two loggerhead sea turtles, one of which would result in the death of the animal. 2018 BiOp, AR 18 at 01078, 01080. Thus, the Fisheries Service's EFPs reverse protections in place for leatherback sea turtles despite continuing population declines and the

agency's admission that the extinction of Pacific leatherbacks "is almost certain in the immediate future." AR 258 at 13486.

On September 12, 2019, Plaintiffs filed a motion for summary judgment. (Pls.' Mot., Dkt. No. 26.) Also on September 12, 2019, Plaintiffs filed a motion to admit extra-record evidence to include the 2017 BiOp in the administrative record, which was granted. (Dkt. Nos. 27 & 41.)[1]

On October 10, 2019, Defendants filed an opposition to the motion for summary judgment and cross-motion for summary judgment. (Defs.' Opp'n, Dkt. No. 34.) On October 28, 2019, Plaintiffs filed an opposition to the cross-motion and a reply in support of the motion for summary judgment. (Pls.' Reply, Dkt. No. 37.) On November 15, 2019, Defendants filed a surreply to Plaintiffs' motion for summary judgment and a reply in support of the cross-motion. (Defs.' Surreply, Dkt. No. 38.)

## II. LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A court reviews final agency actions under the "arbitrary and capricious" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *Friends of Endangered Species v. Jantzen*, 760 F.2d 976, 980–81 (9th Cir.1985). Under the APA, the court "shall" set aside any agency decision that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

An agency action is arbitrary and capricious if "the agency has relied on factors which

---

[1] The Court, however, is not considering the declaration of Ronald Salz, which the Government filed with its opposition and asked to be considered should the 2017 BiOp be admitted in the record, because the NMFS's signed biological opinion must stand on its own. (Defs.' Opp'n at 10 n. 3; Decl. of Ronald Salz, Dkt. No. 36-1.)

Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

Review under this "arbitrary and capricious" standard is narrow, and the reviewing court may not substitute its judgment for that of the agency. *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1215 (9th Cir.2008). Despite this narrow scope of review, the court's inquiry must be "searching and careful." *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989). Ultimately, "the agency must articulate a rational connection between the facts found and the conclusions made." *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526 (9th Cir.1997) (citing *U.S. v. Louisiana–Pac. Corp.*, 967 F.2d 1372, 1376 (9th Cir.1992)).

### III. DISCUSSION

#### A. Whether the Fisheries Service violated the ESA

Plaintiffs argue that the Fisheries Service's issuance of the longline permits violated the ESA on the grounds that it disregarded the best available science and binding case law when it issued the permit. (Pls.' Mot. at 6.) At the completion of formal consultation, the NMFS issues a biological opinion, providing its evaluation of whether the agency action may jeopardize any listed species' continued existence. The ESA requires the consultation process and resulting biological opinion to be based on "the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8). To comply with this requirement, the Fisheries Service "cannot ignore available biological information," because to do so would violate the ESA "by failing to use the best information available to prepare comprehensive biological opinions considering all stages of the agency action, and thus failing to adequately assess whether the agency action was likely to jeopardize the continued existence of any threatened or endangered species, as required by section 7(a)(2)." *Conner v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988). "To hold otherwise would eviscerate Congress' intent to 'give the benefit of the doubt to the species.'" *Id.* at 1454.

Here, Plaintiffs contend that the Government failed to use the best available science when it ignored the 2017 BiOp, which showed that the number of nesting Pacific leatherbacks and the number of leatherbacks off California have declined beyond the numbers in the 2018 BiOp, and by ignoring bycatch data. (Pls.' Mot. at 10.) The 2017 BiOp states that "Pacific populations have declined from an estimated 81,000 individuals to less than 3,000 total adults and subadults," of which 562 were nesting females. 2017 BiOp at 108. This reduction is attributed to an estimated population decline of almost six percent per year since 1984. *Id.* Despite this dire estimate, the 2018 BiOp stated "that there are approximately 2,600 nesting females in the population," which was "currently the best available information as data from 2012 through the present has not been analyzed." 2018 BiOp, AR 18 at 01043.

In opposition, the Government argues that the 562 estimate in the 2017 BiOp represents the annual number of nesting female western Pacific leatherback sea turtles, rather than the total number of 2,600. (Defs.' Opp'n at 10.) To the contrary, the 2017 BiOp estimates the total Pacific population as "less than 3,000 total adults and subadults." 2017 BiOp at 108. At the hearing, the Court asked how the Government reconciled the difference in population estimates, and the Government argued that the 2017 BiOp's failure to clearly identify the population estimate as "annual" versus total was ambiguous. The Government then explained that the 2018 BiOp used a different remigration interval—the number of years before a nesting female returns to the beach to nest— to estimate the total population of nesting females as 2,600.

Notwithstanding, the Court notes that the Government does not dispute that it did not address the 2017 BiOp, and Defendants conceded as much at the hearing. Rather, it argues that the 2017 BiOp is not "superior" to the 2018 BiOp, and that they relied on the same scientific reports and data to estimate the nesting female Pacific leatherback sea turtle population. (Defs.' Opp'n at 11.) In failing to satisfy its procedural obligation to address the 2017 BiOp, the Government also missed the opportunity to clarify the findings in the 2017 BiOp and reconcile them with the remainder of the 2018 BiOp. By failing to consider its own prior opinion, Defendants' 2018 BiOp on the Longline Permit, issued under section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1356(a)(2), failed to consider the best available science. *See Nat'l Wildlife Fed'n v. Nat'l Marine*

9

*Fisheries Serv.*, 524 F.3d 917, 930 (9th Cir. 2008). Thus, the 2018 BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706(2).

Accordingly, Plaintiffs are entitled to summary judgment on their first cause of action for violation of the Endangered Species Act, and the Court need not address the additional arguments made.

**B.  Whether the Fisheries Service violated NEPA**

Plaintiff argue that NMFS's failure to consider reasonable alternatives to mitigate the longline permit's environmental impacts, failure to take a hard look at the cumulative impacts, and failure to prepare an environmental impact statement violated NEPA. (Pls.' Mot. at 17.)

NEPA requires federal agencies to file an environmental impact statement ("EIS") before undertaking "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11 (1985). If the agency finds, based on a less formal and less rigorous "environmental assessment," that the proposed action will not significantly affect the environment, the agency can issue a Finding of No Significant Impact ("FONSI") in lieu of the EIS. 40 C.F.R. § 1508.13 (1985). An agency decision that a particular project does not require an EIS will be upheld unless that decision is unreasonable. *Friends of Endangered Species v. Jantzen,* 760 F.2d 976, 985 (9th Cir.1985); *Foundation for North Am. Wild Sheep v. United States,* 681 F.2d 1172, 1177 (9th Cir.1982).

In making the motion, Plaintiffs argue that an EIS to evaluate the impacts of longline fishing was required due to the action's significant effect on the leatherback sea turtle population. (*See* Pls.' Mot. at 23-24.) Where the agency's own finding is that the activity may adversely affect endangered species, it has, "by its own terms ma[de] clear that the [activity] may 'significantly' affect the environment," likely requiring an EIS. *Nat. Res. Def. Council v. Winter*, 518 F.3d 658, 692 (9th Cir. 2008) (citation omitted), *rev'd on other grounds*, 555 U.S. 7 (2008). The 2018 BiOp states that "more than one leatherback may be captured because the two vessels associated with this EFP will likely be fishing during a time and in the area encompassed by the Pacific Leatherback Conservation Area (PLCA); therefore, we anticipate that the risk of an interaction is relatively high." 2018 BiOp, AR 18 at 01068. In April 2017, NMFS found that Pacific

leatherbacks are "declining rapidly," such that "every turtle counts for sustaining and hopefully recovering the population." AR 1038 at J_00007320. In that report, the authors noted that one leatherback turtle killed as bycatch between 2002 and 2015 was a "rare but not negligible" instance of interaction that still required measures to reduce the deaths of bycaught turtles. *Id.* In comparison, the EFPs assume that there will be two leatherback sea turtles bycaught, of which one will be a nesting female that will die.

In opposition, Defendants argue that they "properly concluded that the proposed action would not significantly alter the status quo, and thus would not have a significant impact on the environment necessitating the preparation of an EIS." (Defs.' Opp'n at 25.) In sum, the Fisheries Service considered the potential fatality, but does not believe that one death by bycatch would be expected to have a significant effect on the population. *Id.* at 26.

Defendants also contend that the significance determination implicates "substantial agency expertise" and the Court should defer to the agency given the narrow standard of review. (Def.'s Mot. at 25 (quoting *WildEarth Guardians v. Provencio,* 923 F.3d 655, 672 (9th Cir. 2019) (citation omitted).) The Court disagrees on the grounds that automatically doing so would abdicate the district court's role of ensuring that the agency took a "hard look" at the consequences of its decision. *See Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir. 1988).

While the Fisheries Service may be entitled to some deference, Defendants do not explain how they reconciled the prior opinion that "every turtle counts" to the survival of the species with the EA's current opinion that one turtle is expendable. In fact, the Government seems to think that the "likely" death of one endangered animal is not significant, in part, because, once there is a bycatch mortality, the longline "fishing effort must halt." (Def.'s Opp'n at 26 (citing AR 1 at 00024)). This departure occurred within less than two years, and, at the very least, requires the preparation of an EIS, because it raises a "substantial question" as to whether the action would cause a significant impact to the environment. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).[2]

---

[2] It may well be that one nesting female mortality over two years will not have a significant impact on the environment, but NMFS must still proceed with the EIS procedure rather than rely on an

11

Thus, the Court finds that the failure to find the death of a single sea turtle over a two-year period significant to warrant the preparation of an EIS was arbitrary and capricious. Accordingly, Plaintiffs are entitled to summary judgment on their second cause of action.

### C. Defendants violated MSA

For the reasons set forth above, the Fisheries Service's issuance of the EFP violated the ESA and NEPA. As a result, it also violates the MSA, because the MSA requires that the action be consistent with federal law, including the ESA. *See* 16 U.S.C. § 1953(a)(1)(C); *see also Turtle Island Restoration Network v. United States Dep't of Commerce,* 878 F.3d 725, 730 (9th Cir. 2017).

Accordingly, Plaintiffs are entitled to summary judgment on their third cause of action.

## IV. CONCLUSION

In light of the foregoing, the Court GRANTS Plaintiffs' motion for summary judgment, and DENIES Defendants' cross-motion for summary judgment on the grounds that Defendants' issuance of the Exempted Fishing Permits failed to comply with the Endangered Species Act and the National Environmental Policy Act, and, therefore, also violated the Magnuson-Stevens Fishery Conservation and Management Act, rendering the decision to issue the permits arbitrary, capricious, an abuse of discretion, and not in accordance with law. 5 U.S.C. § 706(2).

Accordingly, the Exempted Fishing Permits, the 2018 Biological Opinion, the EA, and the FONSI are VACATED AND SET ASIDE.

IT IS SO ORDERED.

Dated: December 20, 2019

KANDIS A. WESTMORE
United States Magistrate Judge

---

EA and a questionable FONSI finding for the sake of expediency.